MAY DEPARTMENT STORES CO., DOING BUSINESS AS FAMOUS-BARR CO., v. NATIONAL LABOR RELATIONS BOARD.

No. 39.   Argued October 12, 1945.—Decided December 10, 1945.

*Messrs. Milton H. Tucker* and *Robert T. Burch,* with whom *Messrs. Lyle M. Allen* and *R. Walston Chubb* were on the brief, for petitioner.

*Miss Ruth Weyand,* with whom *Acting Solicitor General Judson, Messrs. Mozart G. Ratner* and *Millard Cass* were on the brief, for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

This writ of certiorari brings here for review the decree of the Circuit Court of Appeals enforcing an order of the National Labor Relations Board which was entered after the Board found upon hearings that petitioner had violated Sections 8 (1) and 8 (5) of the National Labor Relations Act.[1] The petition for the writ presented issues

[1] 49 Stat. 452–53. "Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.

"Sec. 8. It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

.          .          .          .          .

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of Section 9 (a)."

Opinion of the C. C. A., *Labor Board* v. *May Department Stores Co.,* 146 F. 2d 66; determination of National Labor Relations Board, 53 N. L. R. B. 1366.

(1) as to whether two small related departments with thirty to forty employees may be an appropriate bargaining unit when the department store of which they are a part has around three hundred and fifty departments and approximately five thousand employees; (2) as to whether the Board could properly place the name of a Joint Labor Council on the ballot for the employees' bargaining representative when none of the employees were members of the Council but only of a local union which was associated with others in the Council; (3) as to whether seeking authority by the employer from the National War Labor Board to increase wages without taking up the increase with a certified bargaining agent may be an unfair labor practice under § 8 (1) of the Labor Act; and (4) as to the propriety of a Board order to cease and desist generally from unfair labor practices instead of an order to cease and desist only from the type or types of unfair practices which the Board found the employer committed. As these issues presented important problems in the administration of the National Labor Relations Act, certiorari was granted. 324 U. S. 838.

*Appropriate Unit.* After a hearing in which the employer, the petitioner here, the May Department Stores Company, doing business as Famous-Barr Company, a St. Louis department store, took part, the Labor Relations Board, on June 16, 1943, found that all non-supervisory employees of the Company, then 28 in number, working in the main and basement men's busheling rooms, constituted an appropriate unit for collective bargaining within the meaning of § 9 (b) [2] of the Labor Relations Act.

---

[2] 49 Stat. 453, § 9. "(b) The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

An election was ordered. It resulted in the choice and designation of the St. Louis Joint Council, United Retail, Wholesale & Department Store Employees of America, C. I. O., as the representative for collective bargaining of the employees of the unit.

The Company contended that a store-wide unit of its five thousand employees was the most appropriate and at any rate that employees in the women's alteration and the fur alteration departments should be added to the employees in the men's busheling rooms to form the unit. As there is no provision for direct review of the determination and certification of the bargaining representative, the Company, in order to secure judicial review of the finding as to the unit, awaited this proceeding which sought a decree directing it to bargain collectively with the representative. See *Inland Empire Council* v. *Millis*, 325 U. S. 697.

A few months before this proceeding a determination that all employees of the Company subject to stated exceptions were the appropriate unit for collective bargaining had been sought by the C. I. O. The Company objected because no sufficient showing of representation was made and because it took exception to the exclusion of certain employees from the proposed unit. This petition was dismissed for failure of the C. I. O. to make a substantial showing of membership in the suggested store-wide unit. 46 N. L. R. B. 305. That prior application is not a bar to this. The Board was careful to note in this proceeding that a larger unit might be fixed as appropriate if self-organization developed. Other departments of the store had members of this and other unions as employees. This presence of union members throughout the enterprise was a matter of consideration in deciding upon the appropriate unit but was not decisive. Compare *Pittsburgh Plate Glass Co.* v. *Labor Board*, 313 U. S. 146, 156. No labor organization claimed to represent the entire body

of employees. Therefore the Board determined to approve this unit as appropriate so that collective bargaining might start for these employees without waiting until more employees might be organized into a larger unit. Compare *Labor Board* v. *Hearst Publications*, 322 U. S. 111, 134.

Under § 9 (b) the Board is delegated the authority to determine the unit. The judicial review afforded is not for the purpose of weighing the evidence upon which the Board acted and perhaps to overrule the exercise of its discretion but to "guarantee against arbitrary action by the Board." [3] The Board had before it the business of the Company, the numbers of employees, the treatment of all employees as a unit by management with reference to sick leave, hospitalization, employee privileges, vacations, et cetera. Evidence was presented that a large proportion of employees in the proposed unit were members of the same union. It had testimony as to similarity and dissimilarity in tailoring and altering between the men's and women's alteration rooms. There was evidence that those who work on men's clothing, speaking generally, belong to a different union organization than those who work on women's clothes. The Board considered the interchange of workers between the two groups. We think that there was ample testimony to support the Board's conclusion that the employees of the two busheling rooms were an appropriate unit, since these employees had a degree of self-organization and a special trade which sufficiently differentiated them from other employees.

*Form of Ballot.* Petitioner objects to the certification because the ballot contained the name of the St. Louis Joint Council, United Retail, Wholesale & Department Store Employees, as a candidate for bargaining representative from the unit. This was the organization which was

---

[3] S. Rep. No. 573, 74th Cong., 1st Sess., p. 14.

certified. It had filed the petition for determination of the representative. The Council claimed that more than 51% of the employees in the suggested unit had designated it as their collective bargaining representative. The Board directs what names go on the ballot. Unless there is a showing of a substantial number of employees in the proposed unit who have become members of and selected the petitioner as their bargaining representative, the Board does not ordinarily order an election.[4] This is an administrative policy of the Board. In this case, on the Joint Council's petition for certification, the Board found that the Council had a majority of the employees. As a matter of fact it was a local union which the employees had selected and joined. The Board pointed out in its finding of facts on the petition for an election that the Joint Council represented this local and similar locals in other stores.

The Company says that some employees may have been misled by the ballot into thinking that the Joint Council had a substantial number of the unit's employees as members, because elections are not ordinarily called unless that situation exists. The local was represented by the Joint Council. Cf. *Labor Board* v. *Franks Bros. Co.,* 137 F. 2d 989, 992, affirmed on other grounds, *Franks Bros. Co.* v. *Labor Board,* 321 U. S. 702. The Joint Council was chosen by a majority of the employees of the unit and certified. In the circumstances of this election, we see no basis for the Company's objection to the certified representative on the ground of possible confusion of the employees.

*Action on Wages.* The Board found that the Company interfered with, restrained and coerced its employees in the exercise of the rights guaranteed by § 7 of the Act,

---

[4] *In re Houston Shipbuilding Corp.,* 41 N. L. R. B. 638; *In re American Manufacturing Co.,* 41 N. L. R. B. 995.

under the circumstances herein detailed, in seeking the necessary approval (56 Stat. 765; Executive Order 9250, 7 Fed. Reg. 7871) on August 30, 1943, of the National War Labor Board for an upward wage adjustment for a large proportion of its employees, including the employees of the unit here involved, without bargaining collectively on the subject of the wages with the certified union. A letter accompanied the request to the War Labor Board which explained that certain craft employees, not here involved, were excluded from the application for authority to increase wages because they were covered by collective bargaining agreements. The letter went on to say:

"The St. Louis Joint Council, United Retail, Wholesale and Department Store Employees of America, C. I. O., . . . has been certified by the National Labor Relations Board, but we do not regard this as an appropriate unit and have consistently taken that position and have so notified all parties concerned. It is our intention to submit that question to the Courts, if and when the occasion arises. We have not recognized this Union and have not bargained with it for the employees in Departments 280 or 281 and no negotiations with that Union are pending. It is intended, however, that the employees in Departments 280 and 281 shall be included in this application.

"We do not believe that any of the organizations named in the application, nor the organization named above, have any interest whatever in the enclosed application. However, if the organization named above should object to the inclusion of the employees of Departments 280 and 281 in the application, you are advised that said application may be considered as having been amended so as to exclude those employees from the application."

The next morning the employees were told over the store address system of the application for a wage increase for all employees, except higher paid executives and those employees "whose salaries have been fixed by closed shop

agreements." A short time later another reference to the application was made over the address system. A similar announcement appeared in the September 3 issue of the store paper. The conditional offer to exclude the employees of the unit was not referred to in the announcements. Upon these facts the Board found a violation of § 8 (1).

The Company urges that its request for authority, without negotiation with the certified union as to the application to the War Labor Board, was not an unfair practice under § 8 (1) but only a necessary result of its position on non-recognition of the certified representative because the Company did not agree with the Board's determination of the appropriate unit for the selection of representatives. The Company says it could not give recognition to the certified agent and maintain this position.

We have in a preceding division of this opinion stated our conclusion that the Joint Council was a properly certified bargaining representative. Therefore at the time of the request to the War Labor Board for authority to increase wages, the Joint Council must be considered as a properly certified bargaining agent. Company action in regard to it must be judged in that light even though its attitude toward the certification made its choice difficult.

The Joint Council was certified on July 12, 1943. After the election, the Council had requested a conference with the Company for negotiating a contract to cover wages, hours and working conditions. This request was declined on July 19th with the statement that the Company did not agree with the decision of the Board and desired to preserve its full rights to question the result as it "may see fit." The application to the War Labor Board followed on August 30th.

It is settled law that the Labor Relations Act makes it an employer's duty to bargain collectively only with the

duly recognized or accredited representative of the employees. Disregard of this duty violates § 8 (1) of the Act. § 9 (a). *Medo Corp.* v. *Labor Board,* 321 U. S. 678, 683–84. Any other conclusion would infringe an essential principle of collective bargaining. See *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332, 338. Employer action to bring about changes in wage scales without consultation and negotiation with the certified representative of its employees cannot, we think, logically or realistically, be distinguished from bargaining with individuals or minorities. The fact that the application to the War Labor Board was not the actual increase of wages but a necessary preliminary does not make unilateral action, accompanied by publication of the step taken to the employees, any the less objectionable. The application to the War Labor Board marked a unilateral determination by the Company that the employees of this unit should have the specific increase deemed due them by the Company or none at all, if the bargaining agent should object in accordance with the letter quoted above. The employer was not getting into position to negotiate with the agent. He declared the contrary and proposed that he, as employer, would make the increase if permission were granted.

Two national labor groups had each separately sought for months to organize the Company. One effort to secure the designation of a unit had failed. The present designation was made over the protests of the Company. It had urged in its motion for reconsideration of the order of election:

"There are two competing labor organizations seeking to organize the employees in this store. By this decision one of them is granted an election in the unit composed of two departments. There are some 350 departments in this store and if this Employer is to be confronted with elections and separate bargaining for each one or two de-

partments it will be an endless and intolerable interference with store operations, which should not be permitted."

By going ahead with wage adjustments without negotiation with the bargaining agent, it took a step which justified the conclusion of the Board as to the violation of § 8 (1). Such unilateral action minimizes the influence of organized bargaining. It interferes with the right of self-organization by emphasizing to the employees that there is no necessity for a collective bargaining agent. If successful in securing approval for the proposed increase of wages, it might well, as the Board points out, block the bargaining representative in securing further wage adjustments.

It may be that the Company sought only to preserve its opportunity to contest the certification of the unit. It is pointed out that the increases for which approval was sought covered several thousand employees and that it is hardly conceivable that a general increase for so many would be sought to injure so few. But the Board's contention is not that the application, as a whole, was for the purpose of undermining the Council. Its conclusion was that the manner of presenting and publicizing the application had the effect of coercing the employees. Instead of taking up the increase of this unit's wages with the Council, filing a joint application, with reservation of the Company's legal right to challenge the certification of the bargaining agent when any complaint might be filed for refusal to bargain collectively, or, omitting the employees of the questioned unit, if the Council would not join in such an application, the Company chose to ignore the properly certified agent. Nor can we agree that if, under the procedure suggested, the employees in this unit had been omitted from the employees who received increases, there would have been danger that the National Labor Relations Board would have considered such omission an

unfair labor practice. Whatever weight an omission might have under other circumstances, under these it would have followed an effort to avoid injury to the employees and could not properly be held an interference with their rights.

We find no basis for eliminating the announcements or the publication from consideration on the ground that they were an exercise of the right of free expression, secured by the First Amendment. They are a part of the totality of Company activities and were properly received by the Board as evidence of the unilateral action of the employer. *Labor Board* v. *Virginia Power Co.,* 314 U. S. 469, 477.

*Breadth of Order.* Petitioner complains here of the refusal of the Court to modify paragraph 1 (b) of the Board's order to the extent which petitioner explicitly asked for below in its petition for rehearing.[5] That paragraph, together with another which enjoins refusal to bargain, is

---

[5] Section 10 (e) of the National Labor Relations Act, 49 Stat. 454, precludes the consideration by the Circuit Court of any objection not raised before the Board, unless such failure is excusable because of "extraordinary circumstances." This Court therefore is authorized, *sua sponte,* to appraise the record to determine the power of the Circuit Court to review paragraph 1 (b) of the Board's order. *Labor Board* v. *Bradford Dyeing Assn.,* 310 U. S. 318, 341.

In this proceeding the paragraph first appeared in the intermediate report of the Board's examiner. The petitioner excepted specifically to paragraph 1 (b) of the proposed order as "not supported or justified by the record." This was the only objection made to the paragraph in question in the record of the proceedings before the Board. The examiner's recommendation was adopted by the Board in its order. Unless this objection was sufficiently specific to apprise the Board of the question now presented, the Circuit Court had no power to consider it. *Marshall Field & Co.* v. *Labor Board,* 318 U. S. 253. In the *Marshall Field* case we declined to consider an issue as to the power of the Board to grant a back pay order which was construed as barring the deduction of unemployment compensation from the award, although the question was raised by answer and decided by

set out below.[6]   Petitioner argues that the broad, blanket provisions of 1 (b) are invalid, even though, of course, restricted to the few employees in the affected unit.   The language of the prohibition covers interferences with all the rights of these employees which are secured by § 7 of the Labor Act, while at the most, petitioner urges, the

the Circuit Court of Appeals, *Labor Board* v. *Marshall Field & Co.*, 129 F. 2d 169.   Our reason for refusing review was that the only objection to the Board's power was error by the examiner "in making each and every recommendation."   The remedy recommended by the examiner was the usual back pay less earnings without any word in the report as to the unemployment compensation.   This was too general to apprise the Board of an intention to bring up the question of the deductibility of the compensation and of the necessity for findings.

Although it falls short of desirable specificity, we think the objection was sufficient in the present case.   No further findings are needed.   The paragraph in issue is a standard form of order frequently used by the Board; the same question with respect to an almost identical order was considered by this Court in *Labor Board* v. *Express Pub. Co.*, 312 U. S. 426, and has been a frequent subject of dispute in the Circuit Courts (see n. 10 *infra*).   These circumstances coupled with an objection that the order was "not supported or justified by the record" put the Board on notice of the issue now presented.

[6] Decreed that May Department Stores Company, etc., shall: "1. Cease and desist from: (a) Refusing to bargain collectively with St. Louis Joint Council, United Retail & Department Store Employees of America, affiliated with the Congress of Industrial Organizations, as the exclusive representative of all its employees at its St. Louis store engaged in the busheling room, second floor, department 280, and in the busheling room, basement, department 281, including regular extra employees in these departments, but excluding the two foremen and all other employees of the respondent;

"(b) In any other manner interfering with, restraining, or coercing its employees who are referred to in paragraph 1 (a) in the exercise of their right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act."

Board has found and the Circuit Court sustained only two unfair labor practices by petitioner, "(1) refusal to bargain and (2) the storewide salary increase." Both of these, it is asserted, are but incidents in petitioner's effort to obtain judicial review of the Board's certification. As the Board's selection of an appropriate unit to choose the employees' bargaining representative and the Board's subsequent certification of the representative chosen, § 9, are not judicially reviewable directly, petitioner takes the position that it committed the unfair labor practice of refusing to bargain with an accredited union merely to open the way for judicial review of the certification.[7] Consequently petitioner urges the cease and desist order should be no broader than the refusal to bargain which is covered by paragraph 1 (a), note 6 *supra,* with the addition of "or from any other acts in any manner interfering with the representative's efforts to negotiate." The suggested addition is taken from the *Express Publishing Company* case, 312 U. S. at 438. Thus the breadth of paragraph 1 (b) of the Board's order is sharply challenged as being beyond the power of the Board in view of the evidence and findings in this case.

The scope of injunctions which follow National Labor Relations Board determinations is important to employer and employee. While contempt proceedings can be instituted only by the Board and in the public interest,[8] the possibility of contempt penalties by the court for future Labor Act violations adds sufficient additional sanctions to make material the difference between enjoined and non-enjoined employer activities.[9] The deci-

---

[7] See *American Federation of Labor* v. *Labor Board,* 308 U. S. 401; *Pittsburgh Plate Glass Co.* v. *Labor Board,* 313 U. S. 146; *Inland Empire Council* v. *Millis,* 325 U. S. 697.

[8] *Amalgamated Workers* v. *Edison Co.,* 309 U. S. 261, 269.

[9] See for business operations under contempt orders 41 Columbia L. Rev. at 913.

sion in the *Express Publishing Company* case emphasized this issue.[10] The paragraph under attack in that case was substantially like the paragraph here attacked.

[10] The problem of the scope of injunction dealt with in *Labor Board* v. *Express Publishing Co.*, 312 U. S. 426, has recently received careful consideration by judges and writers. 41 Columbia L. Rev. 911; 29 Georgetown L. J. 1026; 53 Harvard L. Rev. 472; 23 Boston University L. Rev. 447; 54 Yale L. J. 141.

Illustrative of the decisions in the Circuit Courts are the following cases:

1. National Labor Relations Board

(*a*) *Upholding a general § 8 (1) order on the basis of a single unfair labor practice (the nature of the unfair practices is given in brackets).*—*Labor Board* v. *Highland Park Mfg. Co.,* 110 F. 2d 632 (C. C. A. 4) [§ 8 (5)]; *Art Metals Const. Co.* v. *Board,* 110 F. 2d 148 (C. C. A. 2) [§ 8 (5)]; *Wilson & Co.* v. *Board,* 124 F. 2d 845 (C. C. A. 7) [§ 8 (3)]; *Labor Board* v. *Sunbeam Electric Mfg. Co.,* 133 F. 2d 856 (C. C. A. 7) [§ 8 (1)]; *Labor Board* v. *Standard Oil Co.,* 138 F. 2d 885 (C. C. A. 2) [§ 8 (2)].

(*b*) *Upholding a general § 8 (1) order where there was more than one unfair labor practice.*—*Labor Board* v. *Boss Mfg. Co.,* 107 F. 2d 574 (C. C. A. 7) [§§ 8 (1), 8 (3), 8 (5)]; *Labor Board* v. *Reed & Prince Mfg. Co.,* 118 F. 2d 874 (C. C. A. 1) [§§ 8 (1), 8 (3), 8 (5)]; *F. W. Woolworth Co.* v. *Board,* 121 F. 2d 658 (C. C. A. 2) [§§ 8 (1), 8 (3)]; *Board* v. *Algoma Net Co.,* 124 F. 2d 730 (C. C. A. 7) [§§ 8 (1), 8 (3)]; *Labor Board* v. *Baldwin Locomotive Works,* 128 F. 2d 39 (C. C. A. 3) [§§ 8 (1), 8 (2), 8 (3), 8 (4)]; *Labor Board* v. *Brezner Tanning Co.,* 141 F. 2d 62 (C. C. A. 1) [§§ 8 (1), 8 (3)]; *Idaho Potato Growers* v. *Board,* 144 F. 2d 295 (C. C. A. 9) [§§ 8 (3), 8 (5)].

(*c*) *Limiting a § 8 (1) order based on a single unfair labor practice to acts specifically condemned.*—*Globe Cotton Mills* v. *Board,* 103 F. 2d 91 (C. C. A. 5) [§ 8 (5)]; *Labor Board* v. *Swift & Co.,* 108 F. 2d 988 (C. C. A. 7) [§ 8 (2)]; *McQuay-Norris Mfg. Co.* v. *Board,* 119 F. 2d 1009 (C. C. A. 7) [§ 8 (5)]; *Labor Board* v. *Newark Morning Ledger Co.,* 120 F. 2d 262 (C. C. A. 3) [§ 8 (3)]; *Labor Board* v. *Burry Biscuit Corp.,* 123 F. 2d 540 (C. C. A. 7) [§ 8 (2)]; *Labor Board* v. *Stone,* 125 F. 2d 752 (C. C. A. 7) [§ 8 (1)]; *Commonwealth Edison Co.* v. *Board,* 135 F. 2d 891 (C. C. A. 7) [§ 8 (2)]; *Consolidated Aircraft Corp.* v. *Board,* 141 F. 2d 785 (C. C. A. 9) [§ 8 (1)]; *Labor Board* v. *Walt Disney Productions,* 146 F. 2d 44

The test of the proper scope of a cease and desist order is whether the Board might have reasonably concluded from the evidence that such an order was necessary to prevent the employer before it "from engaging in any unfair labor practice affecting commerce." § 10 (a).[11] Equity has long been accustomed in other fields to reach conclusions as to the scope of orders which are necessary

(C. C. A. 9) [§ 8 (3)]; *Labor Board* v. *Lipshutz*, 149 F. 2d 141 (C. C. A. 5) [§ 8 (1)].

(*d*) *Limiting a § 8 (1) order where there was more than one unfair labor practice.*—*Press Co.* v. *Board*, 73 App. D. C. 103, 118 F. 2d 937 [§§ 8 (1), 8 (3)]; *Labor Board* v. *Grower-Shipper Vegetable Assn.*, 122 F. 2d 368 (C. C. A. 9) [§§ 8 (1), 8 (3)]; *Wilson & Co.* v. *Board*, 123 F. 2d 411 (C. C. A. 8) [§§ 8 (1), 8 (2), 8 (3)]; *Labor Board* v. *Servel, Inc.*, 149 F. 2d 542 (C. C. A. 7) [§§ 8 (1), 8 (3)].

2. Office of Price Administration

*A similar situation prevails with respect to the use of injunctions to restrain violations of regulations issued under the Emergency Price Control Act, 56 Stat. 23.*

(*a*) *Sustaining general injunctions on the basis of particular violations of a regulation.*—*Bowles* v. *Montgomery Ward & Co.*, 143 F. 2d 38 (C. C. A. 7) [preliminary injunction against violation of any price regulation for violation of several provisions of one regulation sustained].

(*b*) *Sustaining limited injunctions.*—*Bowles* v. *Town Hall Grill*, 145 F. 2d 680 (C. C. A. 1) [violation of restaurant ceiling prices on poultry, lobster, gin items; injunction limited to such items sustained]; *Bowles* v. *Sacher*, 146 F. 2d 186 (C. C. A. 2) [sustaining preliminary injunction limited to particular type of violation proved].

3. Federal Trade Commission

(*a*) *Enforcing or affirming order broader than specific acts complained of.*—*Ostler Candy Co.* v. *F. T. C.*, 106 F. 2d 962 (C. C. A. 10); *Hershey Chocolate Corp.* v. *F. T. C.*, 121 F. 2d 968 (C. C. A. 3); *Eugene Dietzgen Co.* v. *F. T. C.*, 142 F. 2d 321 (C. C. A. 7).

(*b*) *Limiting orders to specific acts.*—*F. T. C.* v. *Beechnut Packing Co.*, 257 U. S. 441; *F. T. C.* v. *A. McLean & Son*, 84 F. 2d 910 (C. C. A. 7); *Helen Ardelle, Inc.* v. *F. T. C.*, 101 F. 2d 718 (C. C. A. 9).

[11] *Ethyl Gasoline Corp.* v. *United States*, 309 U. S. 436, 461; *Union Pacific R. Co.* v. *United States*, 313 U. S. 450, 470; *United States* v. *Bausch & Lomb Co.*, 321 U. S. 707, 724.

to prevent interferences with the rights of those who seek the courts' protection.[12]  Injunctions in broad terms are granted even in acts of the widest content, when the court deems them essential to accomplish the purposes of the act.[13]  We think that the Board has the same power to

---

[12] *Hecht Co.* v. *Bowles,* 321 U. S. 321, 328; *Wyoming* v. *Colorado,* 286 U. S. 494, 508.

[13] Sherman Act—*Standard Oil Co.* v. *United States,* 221 U. S. 1, 77:

"It may be conceded that ordinarily where it was found that acts had been done in violation of the statute, adequate measure of relief would result from restraining the doing of such acts in the future. *Swift* v. *United States,* 196 U. S. 375.  But in a case like this, where the condition which has been brought about in violation of the statute, in and of itself, is not only a continued attempt to monopolize, but also a monopolization, the duty to enforce the statute requires the application of broader and more controlling remedies."

"So far as the owners of the stock of the subsidiary corporations and the corporations themselves were concerned after the stock had been transferred, § 6 of the decree enjoined them from in any way conspiring or combining to violate the act or to monopolize or attempt to monopolize in virtue of their ownership of the stock transferred to them, and prohibited all agreements between the subsidiary corporations or other stockholders in the future, tending to produce or bring about further violations of the act."  P. 79.

"We so think, since we construe the sixth paragraph of the decree, not as depriving the stockholders or the corporations, after the dissolution of the combination, of the power to make normal and lawful contracts or agreements, but as restraining them from, by any device whatever, recreating directly or indirectly the illegal combination which the decree dissolved."  P. 81.

*Local 167* v. *United States,* 291 U. S. 293, 299:

"Appellants seek elimination of the provision of the decree that enjoins them from using any of the offices or positions in Local 167 or the shochtim union 'for the purpose of coercing marketmen to buy poultry, poultry feed, or other commodities necessary to the poultry business from particular sellers thereof.'  The United States is entitled to effective relief.  To that end the decree should enjoin acts of the sort that are shown by the evidence to have been done or threatened in furtherance of the conspiracy.  It should be broad enough to prevent evasion.  In framing its provisions doubts should

determine the needed scope of cease and desist orders under the National Labor Relations Act that courts have, when authorized to issue injunctions, in other litigation.

That power of the Board is subject to review under § 10. While the Board has been delegated initially the exclusive authority to prevent unfair labor practices,[14] courts, which are called upon to enforce such orders by their own decrees, may examine its scope to see whether, on the evidence, they go so beyond the authority of the Board as to require modification as a matter of law before enforcement. § 10 (a) and (e). The *Express Publishing Company* case declared:

"To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past." P. 437.

We think that, in the circumstances of this proceeding, although there is a violation of § 8 (1) as well as 8 (5), the violation of 8 (1) is so intertwined with the refusal to bargain with a unit asserted to be certified improperly that, without a clear determination by the Board of an attitude of opposition to the purposes of the Act to protect the rights of employees generally, the decree need not enjoin Company actions which are not determined by the Board to be so motivated.

This conclusion requires a modification of the decree so that the injunction will not apply generally to all viola-

---

be resolved in favor of the Government and against the conspirators. *Warner & Co.* v. *Lilly & Co.*, 265 U. S. 526, 532. . . . When regard is had to the evidence disclosing the numerous purposes of the conspiracy and the acts of coercion customarily employed by defendants, it is plain that the clause referred to cannot be condemned as unnecessary or without warrant."

See *American Foundries* v. *Tri-City Council*, 257 U. S. 184, 194.

[14] S. Rep. No. 573, 74th Cong., 1st Sess., p. 15; H. Rep. No. 1147, 74th Cong., 1st Sess., p. 23.

tions under the Act of the rights of the employees in Departments 280 and 281, but will apply to other interferences, in violation of § 8 (1) or otherwise, with the Council's representation of these employees. There should be added to paragraph 1 (a) of the decree, note 6 *supra,* the following clause, "or from any other acts in any manner interfering with the representative's efforts to negotiate for or represent the above named employees as bargaining agent." Paragraph 1 (b) should be stricken. Textual corrections should be made to conform to these changes. As thus modified, the decree is

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE RUTLEDGE, concurring in part.

I cannot agree, as the Court seems to say and the Labor Board found,[1] that there were two unfair practices in this case, (1) refusal to bargain, contrary to § 8 (5); and (2) interference, restraint and coercion of employees in violation of § 8 (1). I think only one unfair labor practice was shown, namely, refusal to bargain; and for that reason I think the Board's order must be modified to eliminate the restraints based on its finding of violation

_____

[1] The Board adopted the trial examiner's intermediate report without change, the employer not having applied for oral argument. 53 N. L. R. B. 1366. After reviewing the evidence under the separate headings of "A. The refusal to bargain" and "B. Interference, restraint and coercion," the report found as to the former that "on July 19, 1943, and at all times thereafter" the company had refused to bargain collectively with the union; as to the latter "that, by its unilateral action in seeking approval of its proposed wage adjustments," and by later publicizing this action, it had "interfered with, restrained, and coerced its employees" in the exercise of the rights guaranteed in § 7. There were separate and independent conclusions of law based on these findings, to which the separate provisions of the order related.

of § 8 (1), as the *Express Publishing Company* case, 312 U. S. 426, requires in such a situation.

I am unable to understand the majority's application of that case to a situation in which the Board has found there were two different and substantial violations of the Act. The Court does not hold to the contrary or rule that either finding was unsupported by the evidence. Rather it seems to approve and sustain both. Yet it modifies, as I think ambiguously,[2] the relief which the Board found appropriate to prevent a repetition of the interference, coercion and restraint it determined had been inflicted upon the employees, in addition to the refusal to bargain. The *Express Publishing* case covers no such situation. It was limited to one where the Board had imposed both types of restraint upon a finding only of refusal to bargain.[3]

It is apposite to inquire, therefore, whether that case has now been expanded to forbid the Board to impose

---

[2] The modification directed by the Court, if it is more than a change in the form of words used in Paragraph 1 (b) of the Board's order, necessarily cuts down the substance of the order. But since the injunction will apply "to other interferences, in violation of § 8 (1) or otherwise, with the Council's representation" of employees in Departments 280 and 281, and since violation of § 8 (1) includes interference, restraint or coercion of employees' rights as guaranteed by § 7, it is difficult to understand in just what particulars the order has been modified. In the absence of more definite specification we must accept the Court's modification as meaning that some substantial change from the order's terms is intended.

[3] Under the ruling the Board is not free to utilize § 8 (1) as a device for multiplying an unfair practice under § 8 (5), so that the single act of refusing to bargain may be made to justify an order forbidding not only that conduct but also the numerous types of unfair practice prohibited by the broad language of § 8 (1). The gist of the decision was that the Board cannot thus pile unfair practice on unfair practice, like presumption on presumption, for purposes of enforceable relief, notwithstanding the act of merely refusing to bargain may be held technically to violate both sections in view of the language of § 7. *Labor Board* v. *Express Publishing Co.*, 312 U. S. 426, 433.

both types of restraint where it has found both kinds of violation and neither finding is overturned. If so, I think the result squarely conflicts with repeated decisions, reflected in the language of the opinion in the *Express Publishing* case itself, that "having found the acts which constitute the unfair labor practice the Board is free to restrain the practice and other like or related unlawful acts." 312 U. S. 426, 436.[4]

It is important for the administration of the Act to know whether the Board is to be free to adapt the remedy to fit the evil it has found to exist, as the statute commands, § 10 (c); or, on the contrary, its remedy thus adapted may be stricken down or modified although the finding which justifies it is approved. That, in my judgment, goes beyond correction of abuse of the Board's discretion and substitutes the Court's judgment for the Board's in devising the appropriate remedy.

For this reason it becomes important to state the different reasons why I think the order should be modified to eliminate any restraint based upon the finding of violation of § 8 (1). It is not because this Court has power or discretion, when there are two substantial and different unfair practices, to modify the Board's order by restricting the relief to what is appropriate to prevent

---

[4] This Court has, in various contexts, declared that the particular means by which the effects of unfair labor practices are to be expunged is for the Board and not for the courts to determine. *Virginia Electric & Power Co.* v. *Labor Board,* 319 U. S. 533, 539; *Labor Board* v. *Link-Belt Co.,* 311 U. S. 584, 600; *International Association of Machinists* v. *Labor Board,* 311 U. S. 72, 82. See *Labor Board* v. *Bradford Dyeing Association,* 310 U. S. 318, 342–343. And the Court has said that "the relation of remedy to policy is peculiarly a matter for administrative competence" and that "courts must not enter the allowable area of the Board's discretion. . . ." *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 194. See also *Regal Knitwear Co.* v. *Labor Board,* 324 U. S. 9, 13.

repeating only one or by other modification to eliminate relief appropriately designed by the Board to prevent repetition of unfair practices it has found to exist. It is because, in my opinion, there was only one unfair practice and that was the refusal to bargain. Hence I think the *Express Publishing* case exactly applies, and does so without necessity for extending the scope of its ruling as the Court's application appears to do.

In my judgment, an employer does not commit an unfair labor practice when he does no more than exercise rights secured by the Federal Constitution and laws, including the Wagner Act.[5] That Act does not put him to the choice of giving up his rights or exercising them on pain of being found guilty of unfair practice. Apart from the evidence relating to refusal to bargain under § 8 (5), there was nothing, in my opinion, which went beyond what was necessary to exercise or preserve the employer's rights secured by law. The application to the War Labor Board for approval of the proposed weekly increase of $2.00 for all the St. Louis employees, except those represented by recognized unions, was made August 31, 1943, shortly after the company had declined to bargain with the union in order to preserve its right to contest appropriateness of the unit. Announcements of this action over the public address system followed on September 1 and 11, with one also in "Store Chat" on September 3.

In the background of the facts, I do not think these acts amounted to more than the exercise of legal rights secured to the employer by the Wagner Act, the Stabilization Act and the First Amendment. They constituted neither a wage increase nor an offer of one. There was no more than taking steps to secure official approval, required in advance by the Stabilization Act, to make an increase, or

---

[5] The Wagner Act, designed to promote the public interest by securing employees' rights, does so by appropriate remedies which also afford protections for the employer. See text at note 13.

tender one, at some uncertain future date, possibly never to arrive. The application was merely a necessary preliminary step to later action, which might or might not materialize, in the nature of dealing with employees or offering to do so, whether directly or through their bargaining representatives.

The case therefore is not *Medo,*[6] in spite of the Board's repeated and insistent argument to the contrary. There the employer actually dealt with the employees, not only negotiating but contracting with them. So in *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332. Here there was neither negotiation nor contracting. There was nothing the employer could offer at that time or the employees then could accept. There was only preparatory action looking to the possibility of later negotiations, and announcement of this action to the employees.

If the employer had the right to put itself legally in position to negotiate, either with the employees or with the union, it also had the right to state what it had done. The effect of the Board's decision, and now apparently of the Court's, is to rule that the Wagner Act so circumscribes an employer that he cannot take the necessary preliminary steps, in this case required by law, to place himself in position to undertake bargaining with his employees, whether directly or through their selected representatives. It is further to hold that if he takes such steps, without having first secured the union's permission, he must keep the fact to himself and dare not disclose to his employees what is to all others a matter of public record. This goes beyond protecting the rights of employees. It gives to the union a veto on management, not only as respects negotiations for terms of employment but for putting the employer in position to negotiate. No case here has gone so far and, in my judgment, the Wagner Act does not contemplate that any should do so.

---

[6] *Medo Photo Supply Corp.* v. *Labor Board,* 321 U. S. 678.

Other facts bear out this conclusion. One is that the Board made no finding that the employer's action was taken with intent to interfere with, restrain or coerce the employees in respect to their rights. Naturally enough there was no such finding. The application affected some 4,500 employees. The unit involved only about 30. It is hardly conceivable that the employer would have taken this step in relation to so many for the purpose of coercing, interfering with or restraining 30. There is lacking, therefore, any showing or finding of intent, a factor the courts have considered important in concluding from otherwise innocent or equivocal facts that unfair practice may exist; [7] and one which in this case the Court apparently makes crucial to determine whether relief relevant to a finding of unfair practice may be sustained. The Board found only that the employer's "unilateral action," in making the application to the War Labor Board and in announcing this fact, *"had the effect* of depriving the Union of credit which normally would accrue to it, and of nullifying its efficacy as a bargaining agent." (Emphasis added.)

Even were this true, it has not heretofore been held that the Wagner Act forbids an employer to take any preliminary step whatever looking toward dealing with his employees in the future which, though not intended to discredit the union, may have the effect to prevent it from obtaining some credit for proposing possible future action which in fact the employer has proposed. Nothing in the Act requires an employer to maintain a union's prestige or to give it credit for originating all proposals

---

[7] See *Montgomery Ward & Co.* v. *Labor Board,* 107 F. 2d 555, 559; *Labor Board* v. *Whittier Mills Co.,* 111 F. 2d 474, 478–479; *Labor Board* v. *Elkland Leather Co.,* 114 F. 2d 221, 224; *Labor Board* v. *Chicago Apparatus Co.,* 116 F. 2d 753, 756–757; *Peter J. Schweitzer, Inc.* v. *Labor Board,* 79 U. S. App. D. C. 178, 144 F. 2d 520, 522.

which may have some future effect upon his relations with his employees. Section 8 (1) forbids interference, coercion and restraint upon employees in the exercise of their rights, not the mere failure of the employer to magnify the union's influence.

Moreover the Board made no finding, presumably because there is no evidence to sustain one, of particular and concrete facts showing that the employer's so-called "unilateral action" adversely affected the union's status among its members or other employees.[8]  It only concluded that the action "reasonably [may] be said to have undermined the Union . . . and to have discouraged employees generally in their union affiliation."  Presumably, since no such effects were proved or found specifically, the basis for this conclusion was the Board's "experience," though this was not referred to in the order or the report on which it was founded.  That foundation was not sufficient, in my judgment, in the absence of proof of more unequivocal acts of unfair practice, of any finding of intent to interfere, restrain or coerce, and of any showing whatever of specific discouraging or undermining effects.  Something more than supposition should underlie a conclusion which supports a finding of unfair practice.

Nor did the employer ignore the union's possibly legitimate status or its right to have a voice in the matter of the increase, if approval by the War Labor Board should materialize.  The application set forth the essential facts with reference to the existing dispute concerning appropriateness of the unit, the employer's intention to litigate the question whenever it might, its nonrecognition of the

---

[8] The general "finding" that the company's action in making the application and publicizing it "interfered with, restrained, and coerced its employees," 53 N. L. R. B. at 1371, rested on no more than the Board's assertion that "it logically follows" that these acts "had the effect" of depriving the union of credit and "may . . . be said to have undermined" it.

union pending the obtaining of a decision, and its purpose for these reasons to include the affected employees in the application. But the application went on to say that if the union should object to the increase, for Departments 280 and 281, the Board should consider it as amended to exclude those employees.[9]

This hardly furnishes ground for concluding that the employer was attempting to "short-circuit" the union, undermine it, or discredit it with the employees. It explicitly recognized that the union, if rightly designated and certified, was entitled to say whether or not the proposed change in pay should become effective. Actually, that right was conceded, regardless of the ultimate outcome of the issue on validity of the certification.[10] Clearly, in view of this concession, there was no effort either to contract with the employees directly or to deal with them, over the union's head, about the increase. Whether or not it should become effective as to them was left, not to the employees themselves, but to the sole and exclusive judgment of the union. There was therefore no semblance of the short-circuiting or direct dealing with employees which was present in both the *Medo* and the *J. I. Case* decisions.

Possibly for this reason the Board is driven back to its "undermining" contention. The company, it says, by including these employees, "put the union on the spot," so that it had no real choice. The argument shows concern for the union's "spot," but gives no recognition to the employer's. The Board does not urge that the company should have excluded these employees from the general application, with good reason. Had this been done,

---

[9] The Board's brief states that the union objected and the War Labor Board accordingly eliminated the bushelmen from the application, citing *In re May Dept. Stores Co.*, N. W. L. B. Case No. 7–6585 (unreported).

[10] See note 11.

obviously the company would have laid itself open to a charge and a finding of unfair practice under § 8 (1). The Board is unwilling, apparently, to put the employer in that dilemma. Cf. *Medo Photo Supply Corp.* v. *Labor Board,* 321 U. S. 678, 699. It does not say, though the Court does by way of dictum, that excluding these employees from the application would not have been an unfair practice. The Board says the employer's only way out was to consult the union before making the application.

This can only mean that the employer was compelled to ask the union's permission to include these employees; in short, that the union had the right under the Wagner Act to veto any action taken by the employer to obtain the necessary legal authority to propose any increase for them, whether directly or through the union. I do not think the Wagner Act confers such a power on the union. Nor did the Stabilization Act or the regulations in effect pursuant to its provisions do so.[11]  Moreover, the employer asserts that it could not refer the matter to the union without surrendering the very rights it was seeking to preserve. This, it says, would have amounted to recog-

[11] The regulations required that the application be signed "either (a) jointly by the employer and a duly recognized collective bargaining agency . . ., or (b) by the employer alone." 4 War Labor Rep. xxxi, xxxiii–xxxiv, § III, 3. It was further required, in either case, that the application state whether or not there was "a duly recognized collective bargaining agency . . . which has not joined with the employer in the application." If so, provision was made for the Wage and Hour Division to notify the organization and request it to inform the office of objections, if any, to action on the application. Cf. note 9. If none were made, the application would be acted on. If made, the matter was to be treated as a dispute and referred to the Conciliation Service of the Department of Labor.

It was apparently in compliance with this regulation that the application in this case set forth the representations concerning the nonrecognition of the union, the dispute, etc. The regulations were amended later to include either a recognized or a certified union. 9 War Labor Rep. xxxiii; 8 Fed. Reg. 16678.

nition and would have foreclosed it later from securing review under the terms of § 10 upon the question whether the unit was appropriate.

Whether or not that is true, there was certainly good reason to believe it so. The right to review is given in terms only as an incident of an unfair practice proceeding. § 10; cf. *American Federation of Labor* v. *Labor Board,* 308 U. S. 401; *Inland Empire Council* v. *Millis,* 325 U. S. 697. In this state of the law, the company's only certain remedy was to withhold recognition until the matter could be determined. Had it recognized the union, by seeking its permission to include the affected employees, there would have been no factual or legal basis for the only proceedings by which review was assured; and, in order to secure it, the company then would have been forced to commit some other act of unfair practice or to take its chance upon some other doubtful remedy. In either event, it would have been confronted with its prior action of dealing with the union and the possibilities this would present either for applying the broad doctrine of estoppel or for occupying the inconsistent, not to say indefensible, position of having recognized the union and then having deliberately repudiated the recognition.

I do not think the Wagner Act was intended to put the employer in such a dilemma. It has been settled that he takes the risk of his error when he mistakenly judges that the unit is not appropriate or for other reason that the duly selected or certified union is not entitled to recognition.[12] As to that, the employer's choice was hard, made so by the very state of the law. Had the law been that

---

[12] See, e. g., *Labor Board* v. *Hearst Publications,* 322 U. S. 111; *Franks Bros. Co.* v. *Labor Board,* 321 U. S. 702; *Medo Photo Supply Corp.* v. *Labor Board,* 321 U. S. 678; *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332; *Pittsburgh Plate Glass Co.* v. *Labor Board,* 313 U. S. 146; *Labor Board* v. *Bradford Dyeing Assn.,* 310 U. S. 318; *National Licorice Co.* v. *Labor Board,* 309 U. S. 350; cf. *H. J. Heinz Co.* v. *Labor Board,* 311 U. S. 514, 523 (employer bargained but refused to sign written contract).

certification was none of the company's business and that the company had *no* right of review, it would have known its rights and its liabilities. That was not and is not the law. The company was told expressly that it had a right of review, but only in an unfair practice proceeding.[13] It was therefore put to the choice, by the statute's terms, of foregoing review or having it by an act of unfair practice. Hence the finding of unfair practice by refusal to bargain must be sustained. But, in taking this risk, the employer did no more than it was compelled by law to do to save its rights under the Wagner Act and to avoid being found guilty, by virtue of some alternative course of conduct relating to the application, of further unfair practices.

I do not agree, therefore, that this necessitous action amounted to an additional unfair practice, in the nature of interference, coercion or restraint of employees' rights, whether or not the finding that it was is sufficient to sustain an independent provision for relief.

A word remains to be said concerning the announcements. As has been stated, if the company had the right to make the application as it did, it also had the right to announce that fact to the public and to the employees, so long as in doing this it did not do so with intent or in a manner to violate the Act. I find nothing in the announcements to justify a finding they were made with this purpose or effect, and there is no finding to the contrary.[14] They were, in my judgment, no more than an

---

[13] The attenuated character of the right makes all the more essential that it not be whittled away or nullified by rulings which make its exercise more precarious than it is by the very conditions of its existence.

[14] The mere fact that the announcements omitted specific reference to Departments 280 and 281 does not supply this element. Such a reference, if made, might have been construed, by its singling out of this unit for special treatment and thereby for invidious implication, as furnishing the very evidence of wrongful specific intent and effect which the Board has failed to find.

exercise of the employer's rights of free speech and a free press, secured by the First Amendment. Cf. *Labor Board* v. *Virginia Electric & Power Co.*, 314 U. S. 469; *Labor Board* v. *Ford Motor Co.*, 114 F. 2d 905; *Labor Board* v. *American Tube Bending Co.*, 134 F. 2d 993; compare *Texas & N. O. R. Co.* v. *Brotherhood*, 281 U. S. 548, 568.

It follows from my view of the case that the Board's order should be modified by striking from it Paragraph 1 (b) together with the words "and (b)" from Paragraph 2 (b), and as so modified enforced. Accordingly, I think the judgment of the Court of Appeals, enforcing the Board's order, should be modified in these respects and, as thus modified, affirmed.

The CHIEF JUSTICE and MR. JUSTICE FRANKFURTER join in this opinion.